UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:5/13/22
```

United States of America,

—v—

Ralph Berry,

                    Defendant.

20-cr-84 (AJN)

OPINION & ORDER

ALISON J. NATHAN, Circuit Judge, sitting by designation:

Defendant Ralph Berry was convicted by a jury of three counts on September 28, 2021.

Dkt. No. 135.  Before the Court are Berry's motions for a judgment of acquittal pursuant to Rule

29 of the Federal Rules of Criminal Procedure, or, alternatively, motion to order a new trial

pursuant to Rule 33.  For the following reasons, the motions are DENIED in part and

GRANTED in part.

## I.    BACKGROUND

For purposes of this opinion, the evidence is viewed in the light most favorable to the

Government and all reasonable inferences are drawn in its favor.  *United States v. Glenn*, 312

F.3d 58, 63 (2d Cir. 2002).

### A.  The Charges

On August 19, 2021, Berry was charged in a superseding indictment with three counts

related to the June 21, 2000, shooting of Caprice Jones, who died in 2010 from complications

related to the shooting injury.  Count One charged Berry with murder through use of a firearm, in

violation of 18 U.S.C. § 924(j)(1); Count Two, killing while engaged in a narcotics conspiracy,

in violation of 21 U.S.C. § 848(e)(1)(A); and Count Three, murder in aid of racketeering, in

violation of 18 U.S.C. § 1959(a)(1).  *See* Dkt. No. 94.  Each count also charged Berry with aiding and abetting or willfully causing the offense under 18 U.S.C. § 2.  *See id.*

### B.  The Trial

Trial commenced on September 22, 2021.  The Government's proof at trial established that the Defendant was the leader of a drug crew that sold crack cocaine in and around the McKinley Houses located in the Bronx, New York, during the 1990s and into the early 2000s. Three former members of the Defendant's crew testified at trial: Frank Lopez, Jesus Ortiz, and Rocky Cintron.  These former members testified about the drug crew's operations and how the Defendant used violence to protect that operation.  This violence included the shooting ordered by the Defendant on June 21, 2000, that resulted in the death of Caprice Jones.

Rocky Cintron testified that he worked for the Defendant for a year or two and was working for the Defendant in 2000 at the time of the shooting.  During this time, he testified that five or six other people worked for the Defendant. Trial Tr. at 150–52.  The Defendant was the leader, and Lopez was the manager of the operation.  *Id*. at 151–53.  Cintron testified that he would pick up the crack to sell from Lopez.  Cintron would then return the proceeds from the drug sales to Lopez, who would in turn give the proceeds to the Defendant.  *Id*. at 153.  Cintron earned a percentage of his earnings.  *Id*. at 156.

Jesus Ortiz testified that he worked for the Defendant from approximately 1993 to 2005, although during that time he periodically left and returned to the group.  *Id*. at 253, 263.  Ortiz recalled that the Defendant had twelve or more people selling for him and that the crew sold approximately 56 grams of crack every other day.  *Id*. at 259, 262.  Ortiz also testified that the Defendant was the leader of the crew and decided who could sell for the crew and where the

crew sold. *Id*. at 262. Lopez, on the other hand, was the manager, so "[i]f any problems come along, he'll take care of it. . . . Most of the time, [with] violence and shootings and stuff like that." *Id*. at 260. Members of the crew carried guns in case issues arose with rival crews. For example, Ortiz testified about an attempt to retaliate against a rival drug dealer named "Janji." *Id*. at 264–65, 269.

Frank Lopez testified that he worked as part of the Defendant's crew from approximately 1993 or 1994 to late 2000. *Id*. at 305. During this time, Lopez was periodically incarcerated, and he also worked for a rival dealer, LaShawn Paige, "for a brief minute" after the Defendant failed to bail him out of jail. *Id* at 322. As part of the crew, Lopez acted as the Defendant's "second in charge," his "lieutenant." *Id*. at 306. He "oversaw the drug dealers on the street, . . . collected all the proceeds, and turned them into" the Defendant. *Id*. at 307. Lopez also acted as the Defendant's "enforcer" and would follow the Defendant's orders to "do whatever that needed to be done to protect the drug operation." *Id*. He recalled that between six and twelve people worked for the Defendant during this time, including Charlie Frazier, Little Wayne, Jesus Ortiz, Rocky Cintron, Tarice Walker, Mohammed, and the Defendant's sister, Jilly. *Id*. at 307–09, 312. As for the operations, Lopez testified that the Defendant maintained multiple stash houses where powder cocaine was cooked into crack cocaine and packaged. *Id*. at 311–15. Dealers worked seven days a week, from "8:00 a.m. sharp until midnight, until closing time." *Id*. at 315–16. Lopez estimated that the crew sold approximately 56 to 60 grams of crack each day. *Id*. at 309–10. The Defendant used the proceeds to buy more cocaine, cars and jewelry, and bail workers out of jail when they were arrested. *Id*. at 315. The Defendant also provided his workers with walkie-talkies, guns, and bullet-proof vests for protection against

rivals.  *Id*. at 318.

The trial testimony centered on one rivalry in particular, between the Defendant's crew and the crew of Lashawn Paige, a rival drug dealer.  Lopez testified that the turf war between the two crews culminated on June 21, 2000.  That day, Paige kicked the Defendant's crew off the McKinley House basketball courts, "telling them they couldn't sell drugs there."  *Id*. at 326–27.  Lopez called the Defendant to inform him of the encroachment.  The Defendant brought some members, including Lopez and Cintron, back to the courts, and "screamed out, really loud, he said: 'Sell my fucking drugs.  Right here.  Stand right here and sell my fuckin drugs.  Nobody better not say anything to you.  Sell my fucking drugs.'"  *Id*. at 327.

That same day, Paige sent a message to the rival crew through Lopez's sister.  While brandishing a gun, he instructed her "to tell your brother and [the Defendant] that they can't just come back out here and put drugs on the block.  It will be like the 4th of July here."  *Id*. at 335.  After learning about the threatening message, Lopez confronted Paige and other members of Paige's crew, including a member named Guy Neal, in a nearby deli.  "[O]ne thing led to another, and LaShawn Paige and Guy and his brother started jumping" Lopez.  *Id*. at 337.  Cintron also testified that he saw Lopez and "Shawn and a couple of his crew" enter the store, after which he heard a "scuffle."  *Id*. at 166.  When Lopez exited the store, he was "holding" and "wiping his face."  *Id*. at 167.

Lopez told the Defendant about the confrontation at the deli.  The Defendant was upset and "heated."  *Id*. at 339.  He handed Lopez a nine-millimeter handgun and told him, "Handle that fucking business."  *Id*. at 340.  Ortiz also testified that Defendant gave Lopez the gun with instructions to "handle his business."  *Id*. at 278–79.  Cintron was standing by his car and

witnessed Lopez speaking with the Defendant before Lopez appeared to put something in his shirt. *Id*. at 167–68.

Lopez testified that he understood the Defendant's instruction as an order to "go shoot [Paige] for what he did, for disrespecting . . . because we were at odds with [Paige] and the fact that I knew that was a violation. [Paige] violated [the Defendant] by beating me up, like, that's a reflection on [the Defendant]." *Id*. at 340. Lopez then followed the Defendant's order and fired shots at the basketball court where Paige was standing until the gun was empty. *Id*. at 341–42. He understood if he did not that he would "have to face the consequences of [the Defendant]. I wouldn't have my position no more, probably wouldn't be able to show my face around anymore." *Id*. at 341.

After the shooting, Lopez fled to Berry's car where Cintron was waiting to drive away. *Id*. at 343. At this point, Cintron saw that Lopez had a gun. *Id*. at 167–68. Berry then flagged the car down, entered it and asked Lopez for the gun. *Id*. at 343–44. Berry ultimately sent Lopez and Ortiz to Massachusetts "until the heat died down." *Id*. at 344–45. After about a month, Berry informed Lopez "that it would be safe to come back down" and they would sell crack elsewhere. *Id*. at 346–47.

LaShawn Paige also testified at trial. He testified that in the late 1990s and early 2000s, his crew and the Defendant's crew competed to sell crack in the McKinley Houses. *Id*. at 64–67. The Defendant began selling crack in the McKinley Houses first, and Paige confirmed that Frank Lopez, Rocky Cintron, and Jesus Ortiz were part of the crew. *Id*. at 68–71. Paige testified that on June 21, 2000, there was a fight in the deli and one of his men, Guy Neal, punched Lopez. *Id*. at 73–74. A little later that day, Paige testified that he was standing on the basketball court when

Lopez entered the court firing a gun, with the Defendant standing behind him.  *Id*. at 74.  He testified that one bullet went through his shorts and another bullet hit Caprice Jones.  *Id*. at 76.

The bullet paralyzed Caprice Jones, who survived another ten years.  He ultimately died on November 21, 2010, of "septic complications of paraplegia due to" the gunshot wound on June 21, 2000.  *Id*. at 194.

Finally, the parties stipulated to the Defendant's multiple prior arrests and convictions for selling crack in the McKinley Houses, including his federal conviction to which he admitted that "between 1995 and April 2007, I and others agreed to sell more than 50 grams of crack cocaine, mostly in the Bronx, New York."  Gov. Ex. 601 at 2; *see also* Trial Tr. at 440.

Through cross-examination, the defense attempted to show that the shooting was not connected to the Defendant's crack business, but instead was "motivated by personal animus between Lopez on the one hand and Paige and one of Paige's associates named Guy Neal on the other."  Def. Br. at 2, Dkt. No. 153.  In particular, the defense argued that the fight and shooting were not over turf, but about Paige and Neal's treatment of Lopez's sister.  *Id*. at 3.

### C.  The Verdict and Post-Trial Motions

At the close of the Government's evidence, Berry moved for a judgment of acquittal pursuant to Rule 29 on all counts, and the Court reserved decision pending post-trial briefing.  Trial Tr. at 513–20.  The jury unanimously convicted Berry of all three counts on September 28, 2021.  Dkt. No. 135.

On October 28, 2021, Berry filed motions for acquittal under Rule 29, or a new trial pursuant to Rule 33 in the alternative.  The Government opposed the motions on December 6, 2021, Dkt. No. 156, and Berry filed a reply on December 20, 2021, Dkt. No. 158.  The Court

held oral argument on February 28, 2022, on one of the arguments in support of Berry's Rule 29 motion—that the common law "year-and-a-day rule" bars his convictions for Counts One and Two.  *See* Oral Arg. Tr., Feb. 28, 2022, Dkt. No. 161.

## II.    RULE 29

### A.  LEGAL STANDARD

Under Federal Rule of Criminal Procedure 29, "a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing Fed. R. Crim. P. 29(a), (c)).  The Second Circuit has stated that a "defendant who challenges the sufficiency of the evidence to support his conviction 'bears a heavy burden.'"  *Id.* (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)); *see also United States v. Gonzalez*, 110 F.3d 936, 940 (2d Cir. 1997).  On such a motion, "[n]ot only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The evidence "must be viewed in light of the totality of the Government's case, since one fact may gain color from others."  *United States v. Tramunti*, 500 F.2d 1334, 1338 (2d Cir. 1974).  This is an "exceedingly deferential standard of review."  *United States v. Pica*, 692 F.3d 79, 86 (2d Cir. 2012) (quoting *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008)).

A "jury's verdict may be based entirely on circumstantial evidence."  *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994).  Further, "[t]he fact that a conviction may be supported

only by the uncorroborated testimony of a single accomplice is not a basis for reversal if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990). "Any lack of corroboration goes merely to the weight of the evidence, not to its sufficiency," and the weight of the evidence "is a matter for argument to the jury." *Id*. The credibility of a witness is particularly "the province of the jury and not of the court." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011).

### B.  ANALYSIS

#### 1.  The Court denies Berry's claim that there was insufficient evidence of an enterprise under Count Three.

Count Three charged Berry with violating 18 U.S.C. § 1959(a), which prohibits certain violent crimes, including murder, committed in aid of racketeering. To establish a violation of § 1959(a), the Government must prove: "(1) that [there] was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992).

Berry challenges the sufficiency of the evidence as to the first element—the existence of an enterprise. He argues that the supposed enterprise lacked "continuity" and "longevity" because there was no "ongoing structure" nor "core personnel" besides the Defendant himself. Def. Br. at 7; Def. Reply at 1. He contends that "[s]upposed members owed no duty of loyalty to any organization and could come and go as they pleased." Def. Br. at 10. The Court is unpersuaded and concludes that the Defendant fails to meet his "very heavy burden" for this

insufficiency claim. *Gonzalez*, 110 F.3d at 940.

An "enterprise" includes "any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1959(b)(2). The existence of an association-in-fact enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. White*, 7 F.4th 90, 99 (2d Cir. 2021) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). An enterprise must have three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)); *see also* Trial Tr. at 647–48 (instructing the jury that an enterprise requires "core personnel who functioned as a continuing unit during a substantial period within the time frame charged in the indictment"). The Supreme Court has instructed that "the very concept of an association in fact is expansive." *Boyle*, 556 U.S. at 946. A group "need not have a hierarchical structure or a 'chain of command'" to be classified as an enterprise. *Id.* at 948. And the Second Circuit has made clear that an association-in-fact enterprise "may continue to exist even though it undergoes changes in membership." *United States v. Gershman*, 31 F.4th 80, 98 (2d Cir. 2022) (quoting *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008)); *see also United States v. Mayes*, No. 12-cr-385 (ARR), 2014 WL 3530862, *3 (E.D.N.Y. July 10, 2014) ("The government does not need to demonstrate a fixed membership or single chain of command in order to satisfy the continuity requirement for an enterprise.").

A rational juror could have found that the evidence at trial established all of the requirements of an enterprise and that the Defendant's crew was an "ongoing organization" that

functioned as a "continuing unit" and remained in existence long enough to pursue a course of conduct, namely selling crack cocaine in the McKinley Houses.  Between six and twelve people worked as part of the Defendant's crew throughout the existence of the enterprise.  This included Lopez, who worked with the Defendant from approximately 1993 or 1994 to late 2000.  Ortiz worked as a street-dealer from approximately 1993 to 2005, and Cintron for a year or two around the 2000 shooting.  These core personnel worked with the enterprise's other various members, including Charlie Frazier, Little Wayne, Tarice Walker, Mohammed, and the Defendant's sister, Jilly, to run the crack operation.  As the second-in-command, Lopez worked with Berry to manage the operation.  Members were expected to work specific hours, from "8:00 a.m. sharp until midnight, until closing time."  Trial Tr. at 316.  In return, they were given a percentage of the proceeds, protective equipment to guard themselves against rivals, and money for bail when necessary.  The crew used violence to protect the enterprise's operation and territory, and nonmembers were excluded from the crew's selling spots.  Paige testified that Berry's crew was already established when he arrived at the McKinley houses, and the two saw each other's crews as competition.  This competitive relationship ultimately culminated in the June 21 shooting.  Thus, a rational jury could conclude that the evidence did not show the sporadic, loosely knit crew that the Defendant proffers, but instead an organized and structured operation with core personnel who worked to accomplish the enterprise's goal of selling crack in the McKinley Houses.  *See United States v. Payne*, 591 F.3d 46, 60–61 (2d Cir. 2010) (rejecting argument that evidence showed merely a group of friends who provided each other "sporadic assistance" rather than a racketeering enterprise).

　　　The Defendant's arguments to the contrary are unavailing.  *First*, the Defendant contends

that Lopez's periods of incarceration while working for Berry disqualify him from being part of the enterprise's core personnel. The Defendant likens his case to *United States v. Morales*, 185 F.3d 74 (2d Cir. 1999), but that case is readily distinguishable. *See* Def. Br. at 9–10. There, the Second Circuit concluded that there was insufficient evidence to support the jury's finding of a single, continuing enterprise when *all* members of the enterprise were incarcerated for seven years of the nine-year period alleged in the indictment. *Morales*, 185 F.3d at 80–81. As the court noted, even "the incarceration of all members of a racketeering enterprise does not automatically signal the end of that enterprise." *Id.* at 80. Far from *all* members being incarcerated, Lopez testified that he was incarcerated twice before the June 21 shooting. Trial Tr. at 401–03. He also testified that he worked for Berry from 1993 or 1994 to 2000, when he was incarcerated again. *Id.* at 305, 322. A jury could have reasonably inferred that Lopez ultimately returned to the enterprise each time following release. Moreover, Lopez testified that members were periodically arrested due to their activities with the enterprise and testified that all of his prior convictions were related to his work with Berry at the McKinley Houses. *Id.* at 315, 392. A reasonable juror could have concluded that Lopez's incarceration did not signal the end of his membership in Berry's crew.

*Second*, the Defendant argues that Lopez's membership in a gang while incarcerated reveals that he was not a core member. *See* Def. Reply at 2. But the Second Circuit has instructed that an individual's "membership in one group does not disprove the existence of another group or one's membership in, or even one's leadership of, that other group." *United States v. Granton*, 704 F. App'x 1, 6 (2d Cir. 2017). Again, based on all the evidence, a reasonable juror could have concluded that this incident did not disrupt Lopez's membership in

11

Berry's crew.

*Third*, the Defendant points to Lopez's testimony that he worked briefly for Paige after Berry failed to bail him out of jail.  But the Second Circuit has not imposed a duty of loyalty on criminal enterprises.  Criminal enterprises often undergo "shifting loyalties" and infighting. *United States v. John*, No. 11-CR-405 (FB) (S-7), 2017 WL 318804, at *2 (E.D.N.Y. Jan. 23, 2017), *aff'd sub nom. United States v. McKenzie*, 749 F. App'x 29 (2d Cir. 2018); *Gershman*, 31 F.4th at 99.  And one core member can depart while another set of members keeps the core intact.  *See Eppolito*, 543 F.3d at 52.  Such is the case here.  Lopez briefly worked with Berry's rival, Paige, out of apparent spite.  *See* Trial Tr. at 322 (Lopez testifying that he worked for Paige because he was "kind of bitter at Ralph").  And he quickly returned to Berry's crew because of the poor working conditions under Paige.  Rather than undermining the existence of an enterprise, Lopez's brief departure due to infighting and subsequent return only underscores that there was an operation to which he could return.  Moreover, a reasonable juror could have concluded that Lopez's brief departure and the "times" when Ortiz "left and came back to the operation," *id*. at 263, did not overlap with each other.  Thus, bearing in mind that the Court must view the evidence in its totality and in the light most favorable to the prosecution, a reasonable juror could have concluded that the core personnel of Berry, Lopez, Ortiz, and Cintron, remained intact during various brief departures.

*Finally*, the Defendant argues that the supposed enterprise lacked a management structure, "apart from Lopez."  Def. Br. at 10.  But the Second Circuit has made clear that the group need not have a hierarchical structure, chain of command, fixed roles for members, or established rules and regulations.  *Boyle*, 556 U.S. at 948; *see also White*, 7 F.4th at 100.  Even if

12

there were such requirements, there was sufficient evidence that the enterprise had these features. As outlined above, the Defendant was the leader.  After starting as a street-dealer, Lopez rose to second-in-command.  The remaining members worked the streets selling the crack cocaine supplied by Berry and managed by Lopez.  Workers were expected to sell during certain hours. To protect the enterprise's operations, the Defendant supplied guns and bullet-proof vests to members to protect them from rival drug crews and would bail out members when they were arrested.  This evidence was more than sufficient to permit a reasonable juror to conclude that the members worked together, under the Defendant's leadership and over a sufficient period of time, to pursue the enterprise's purpose of selling crack cocaine. *See White*, 7 F.4th at 99.

Because a "rational trier of fact" could have found the enterprise existed, *Jackson*, 335 F.3d at 180, the Court denies the Defendant's motion as to Count Three on this basis.

### 2. The Court grants in part and denies in part Berry's claim that his convictions under Counts One and Two are barred by the common law "year-and-a-day rule."

The Defendant next contends that the "year-and-a-day rule" requires the Court to set aside his convictions under Counts One and Two because 18 U.S.C. § 924(j) and 21 U.S.C. § 848(e), respectively, incorporated that aspect of the common-law definition of murder.

At common law, the year-and-a-day rule dictated that a killing was murder only if the victim died within one year and a day of the defendant's conduct.  As Blackstone explained: "In order also to make the killing murder, it is requisite that the party die within a year and a day after the stroke received, or cause of death administered. . . ."  4 William Blackstone, Commentaries *197; *see also* 3 Edward Coke, *Institutes of the Laws of England* *47 ("Murder is when a man of sound memory, and of the age of discretion, unlawfully killeth . . . with malice

afore-thought, either expressed by the party, or implied by law, so as the party wounded, or hurt, etc. die of the wound, or hurt, etc. within a year and a day after the same.").  If the victim did not die within this time period, it was conclusively presumed that causation could not be established because "it [could not] be discerned . . . whether he died of the stroke or poison, or of a natural death."  3 Edward Coke, *Institutes of the Laws of England* *53; *see also* 9 H.S.G. Halsbury, *Laws of England* § 1157 at 571 (Butterworth & Co. 1909) ("If death does not ensue until after the expiration of a year and a day from the date when the injury was inflicted, it is an irrebuttable presumption of law that the death is attributable to some other cause, and the person who inflicted the injury is not punishable for either murder or manslaughter.").

This rule was firmly established as part of the substantive meaning of murder in the common law and was not an arcane concept reserved to academic treatises.  The Supreme Court recognized the rule's place in the common-law definition of murder in 1891.  *Ball v. United States*, 140 U.S. 118, 133 (1891); *see also Hagner v. United States*, 285 U.S. 427, 431 (1932) (noting *Ball*'s recognition of the rule).  The Supreme Court noted that the rule was integral in distinguishing murder from a common assault.  *Ball*, 140 U.S. at 133.

Under this weight of authority, the Government concedes that the year-and-a-day rule was "a substantive aspect of the definition of murder" at common law.  Gov. Br. at 12.  The Government argues, however, that the federal statutes at issue did not incorporate the rule, which it considers "archaic."  *Id*.  The Court first addresses Count One, and then addresses Count Two.

### a)  Count One

Count One charged the Defendant with violating 18 U.S.C. § 924(j), which states that a "person who, in the course of a violation of subsection (c), causes the death of a person through

the use of a firearm, shall—if the killing is a murder (as defined in [18 U.S.C. §] 1111), be punished" as specified.  18 U.S.C. § 924(j)(1).  Section 1111(a), which was codified in 1909, provides the following definition:

> Murder is the unlawful killing of a human being with malice aforethought.  Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

> Any other murder is murder in the second degree.

18 U.S.C. § 1111(a).[1]

The Court begins, as always, with the statutory text.  *Neder v. United States*, 527 U.S. 1, 20–21 (1999).  Statutory terms are to be interpreted consistent with their ordinary meaning at the time Congress enacted the statute.  *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019).  The statutory text at issue, needless to say, provides no instruction on the requisite causation for the "unlawful killing" to constitute "murder" and makes no reference to the year-and-a-day rule. But that absence does not end the matter.  A core principle of statutory interpretation is that when Congress uses a common-law term of art, it presumably intends the common-law meaning of

---

[1] The statute has undergone unrelated amendments since its enactment. In 1909, the statute read:

> Murder is the unlawful killing of a human being with malice aforethought.  Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.  Any other murder is murder in the second degree.

Act of March 4, 1909, Pub. L. No. 60-350, ch. 321 § 273, 35 Stat. 1143 (1909) (codified without amendment at 18 U.S.C. § 452 (1946)).

that term unless it instructs otherwise.  *Id.*; *see also United States v. Soler*, 759 F.3d 226, 233–34

(2d Cir. 2014) (Katzmann, C.J.).  Particularly relevant here, the Supreme Court has instructed:

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and
> meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that
> were attached to each borrowed word in the body of learning from which it was taken and
> the meaning its use will convey to the judicial mind unless otherwise instructed.  In such
> case, absence of contrary direction may be taken as satisfaction with widely accepted
> definitions, not as a departure from them.

*Evans v. United States*, 504 U.S. 255, 259–60 (1992) (quoting *Morissette v. United States*, 342

U.S. 246, 263 (1952)).  The Second Circuit has cautioned that this canon "applies only where the

identity between the common law words and the statutory words is clear," demonstrated by, for

example, "parallelism between the common law terms and the text" of the statute.  *Soler*, 759

F.3d at 233.

  Applying this interpretive canon, it is clear that Congress adopted the common-law year-

and-a-day rule as part of Section 1111's definition of "murder."  First, "murder" is a common-

law term of art and the provision's definition parallels common law language.  *See id.*  It defines

"murder" as the "unlawful killing of a human being with malice aforethought."  This definition is

written in "the common-law tradition."  *United States v. Capers*, 20 F.4th 106, 129 (2d Cir.

2021).  Accordingly, the Court must presume that when Congress adopted the term "murder"

from the common law, it knew and adopted "the cluster of ideas that were attached," unless the

statute directs otherwise.  *See Morissette*, 342 U.S. at 263.  This includes the common law year-

and-a-day rule.  As outlined above, at common law, it was conclusively presumed that the

requisite causation for murder could not be established if the individual died more than a year

and a day after the actus reus.  The Supreme Court, leading commentaries, and lower courts at

the time all reflect this understanding as part of the definition of murder.  *See Ball v. United*

16

*States*, 140 U.S. 118 (1891); Coke, *supra*;. H.S.G. Halsbury, *supra*; *United States v. Hewecker*, 79 F. 59, 64–65 (C.C.S.D.N.Y. 1896) (refusing to conclude that a statute encompassed willful murder because it did not include that the death must occur within a year and a day of the injury). Fewer than twenty years separates the Supreme Court's decision in *Ball* and the codification of Section 1111.  Moreover, the legislative history of Section 1111—in particular, a Special Joint Committee report—suggests an awareness of the *Ball* decision at the time of codification.  Citing the decision, the report explained that it was necessary to enact language specifying jurisdiction over deaths from blows on the high seas.  Special Joint Comm. on the Revision of the Laws, Revision & Codification of the Laws, Etc., H.R.Rep. No. 2, 60th Cong., 1st Sess. 12 (1908); *see also United States v. Chase*, 18 F.3d 1166, 1171 n.4 (4th Cir. 1994); *Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) (Katzmann, J.) (noting that a committee report is among "the most authoritative and reliable materials of legislative history").  Despite the apparent influence of the *Ball* decision, the report contained no discussion of the year-and-a-day rule, suggesting that there was at least no express determination to reject that component of the meaning of murder.  And a little more than twenty years after Section 1111's codification, the Supreme Court echoed *Ball*'s understanding that "to constitute murder it is necessary that death shall occur within a year and a day from the time of the fatal stroke."  *Hagner*, 285 U.S. at 431.  This history is a strong indication that Congress understood "murder" to include the year-and-a-day rule when Section 1111 was codified in 1909.

Finally, there is nothing in the statute to indicate that Congress intended to depart from this "widely accepted definition[]."  *Evans*, 504 U.S. at 259–60.  As noted above, the statute makes no reference to the year-and-a-day rule or the requirements of establishing causation more

generally.  But the Court "cannot infer from the absence of an express reference to [the year-and-a-day rule] that Congress intended to drop" that substantive aspect from the definition of "murder." *Neder*, 527 U.S. at 23.  Rather, Supreme Court precedent dictates that the statute's silence on the matter indicates an intention to continue with the well-settled definition, not a departure from it.  *Evans*, 504 U.S. at 259–60.  The Court is bound by this interpretive precedent.

Although the question of whether the year-and-a-day rule is part of Section 1111's definition of murder is one of first impression in the Second Circuit, other courts have concluded similarly.  In *United States v. Chase*, the Fourth Circuit relied in part on *Evans*'s "well-recognized canon" that statutory terms are generally presumed to have their common-law meanings in concluding that the codification of Section 1111 included the year-and-a-day rule. 18 F.3d at 1170.  The Eighth Circuit has also briefly noted that a district court set aside a conviction for murder charged under Section 1111 because the death did not occur within a year and a day.  *United States v. Stoney End of Horn*, 829 F.3d 681, 685 (8th Cir. 2016).

In resisting this conclusion, the Government makes three principal arguments.  *First*, it argues that "the common law background against which Congress legislates and is presumed to be aware of" is relevant only when the term is undefined.  Arg. Tr. at 11–12; *see also* Gov. Br. at 15.  Meaning, because Section 1111 defines the term murder, there is no need nor basis to look to the common law definition of murder to interpret the statutory text.  *Evans* is again instructive. In *Evans*, the Supreme Court looked expressly to the common law to determine whether "an affirmative act of inducement by a public official, such as a demand, is an element of the offense of extortion 'under color of official right,'" as prohibited and defined by the Hobbs Act, 18 U.S.C. § 1951.  504 U.S. at 256.  Section 1951(b)(2) defines "extortion" as "the obtaining of

property from another, with his consent, induced . . . under color of official right," but it does not instruct on what is required for "extortion . . . under color of official right."  The Court thus looked to the common-law understanding of extortion "under color of his office" because Congress presumably knew and adopted that understanding absent "contrary direction."  *Id*. at 264–65.  Because Congress provided no direction otherwise, the Supreme Court determined that "extortion 'under color of official right'" adopted the common law understanding that no affirmative act of inducement is required.  Such is the case here.  Section 1111 defines murder as the "unlawful killing of a human being with malice aforethought."  It provides no definition of the causation required for the "unlawful killing" to constitute "murder."  To interpret that ambiguity, *Evans* instructs the Court to turn to the common law.  At the time the statute was codified, for such an unlawful killing to constitute common law "murder," the death had to occur within a year and a day of the defendant's action.  There is no contrary indication that Congress intended to depart from that widely accepted understanding.

*Second*, in a related argument, the Government contends that the common-law background is relevant only when the text is "ambiguous or unclear."  Arg. Tr. at 11–12; Gov. Br. at 14.  The Government contends that because Section 1111 is "clear on its face" that it did not incorporate the year-and-a-day rule, concluding otherwise would read an unwritten element into the statute.  Arg. Tr. at 18.  In so arguing, the Government relies on *Dean v. United States*, 556 U.S. 568 (2009).  In *Dean*, the Court held that the sentencing enhancement provision of 18 U.S.C. § 924(c)(1)(A)(iii) does not require that the discharge of a firearm during a crime of violence or a drug trafficking crime be intentional.  In doing so, the Court instructed that courts "ordinarily resist reading words or elements into a statute that do not appear on its face."  556

U.S. at 572.  Because subsection (iii) merely requires that "the firearm is discharged," without specifying that the discharge be done knowingly or intentionally, the discharge may be merely accidental.  *Id.*

The Government's reliance on *Dean* is unpersuasive.  First, *Dean* did not involve the interpretation of a common-law term of art.  As the Second Circuit has instructed, *Evans*'s interpretive canon applies only when "the identity between the common law words and the statutory words is clear."  *Soler*, 759 F.3d at 233.  *Dean*'s principle that courts ought not read elements into statutes is therefore consistent with the Court's instruction in *Evans* that statutory terms borrowed from the common law generally carry their common-law meaning.  For example, in *Neder*, the Court applied the common-law canon to conclude that several federal fraud statutes included a materiality element, even though such an element was indisputably absent from the face of the text.  *Neder*, 527 U.S. at 21–22; *see also Sekhar v. United States*, 570 U.S. 729, 733–34 (2013) (relying on the common law to conclude the extorted property under 18 U.S.C. § 1951(b)(2) must be transferable).  Here too, concluding that Congress codified the common-law causation required to constitute "murder" when it used that word in 1909 is not reading an element into the statute.  Rather, *Evans* and *Neder* instruct that the common-law meaning is a part of that statute absent "contrary direction."  *Evans*, 504 U.S. at 259.

Second, the *Dean* Court emphasized structural and textual features that affirmatively indicated Congress's intention to exclude an intentionality requirement.  For example, Congress employed passive voice in the enhancement provision and expressly included an intent requirement in a separate enhancement provision.  *Dean*, 556 U.S. at 572–73.  Again, the text and structure of Section 1111 contain no indication that Congress intended to exclude the year-

20

and-a-day rule.  The Government argues that Section 1111's *silence* on the year-and-a-day rule makes it unambiguous.  Arg. Tr. at 18.  But this contention directly contravenes the Supreme Court's dictate in *Evans*, *Neder*, and elsewhere that silence is not an invitation for courts to eschew common-law meanings, but rather an indication that Congress intended to incorporate that meaning.  *Evans*, 504 U.S. at 259–60; *Neder*, 527 U.S. at 23.  The Government failed, both in briefing and at oral argument, to distinguish this aspect of *Evans*.

*Third* and finally, the Government argues that the Court should conclude that the year-and-a-day rule is "obsolete," and so has no place in a modern murder prosecution.  Gov. Br. at 15–16 (quoting *Rogers v. Tennessee*, 532 U.S. 451, 463 (2001)).  It relies on *Rogers*, where the Supreme Court noted that the rule was "without question obsolete," given modern advances in the medical and other related scientific fields.  *Rogers*, 532 U.S. at 463.  The Court has "declined to follow any rule that a statutory term is to be given its common-law meaning[] when that meaning is obsolete or inconsistent with the statute's purpose."  *Taylor v. United States*, 495 U.S. 575, 594 (1990).  But the proper reference point for a term's meaning is "when the [statute] was passed."  *Id.* at 595; *see also New Prime Inc*, 139 S. Ct.at 539 (cautioning that courts may not "freely invest old statutory terms with new meanings").  The Court's view of the wisdom of the rule in 2022, or 2001, sheds no light on Congress's intention in 1909 when Section 1111 was codified.  As detailed above and as the Government concedes, the rule was part of the common-law definition of murder at that time.  The Court may not ignore the well-known common-law meaning in 1909 because the rule may lack import now.  It is for Congress to determine whether to amend the statute to better conform with modern medical advances.

Because Congress "presumably kn[e]w and adopt[ed] the cluster of ideas that were

21

attached to" the common-law meaning of murder at the time of codification, and there is no

contrary direction otherwise, the year-and-a-day rule is incorporated in the definition of

"murder" under 18 U.S.C. § 1111.  Unless and until Congress instructs otherwise, this Court is

bound by Supreme Court precedent and the statutory text enacted by Congress in 1909.  18

U.S.C. § 924(j) expressly incorporates this statutory text by requiring that the killing be a

"murder as defined in section 1111."  The killing in this case cannot constitute murder "as

defined in section 1111" because the victim died more than a year and a day after the fatal blow.

The Court thus grants Berry's motion for a judgment of acquittal as to Count One.

### b)  Count Two

The analysis above does not lead to the same conclusion for Count Two.  Unlike Section

1111, 21 U.S.C. § 848(e) does not define "murder as the unlawful killing of a human being with

malice aforethought" in the common-law tradition.  18 U.S.C. § 1111(a).  Rather, Section 848(e)

prohibits, *inter alia*, the "intentional killing of an individual" while the perpetrator is "engaging

in an offense punishable under" 21 U.S.C. § 841(b)(1)(A).[2]  Moreover, in Section 848(e),

Congress adopted a statute that is both narrower and broader than common-law murder—by its

terms the requisite *mens rea* is narrower and the *actus reus* broader.  The provision further

---

[2] The full provision provides:

    (1) In addition to the other penalties set forth in this section—

        (A) any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death . . . .

21 U.S.C. § 848(e)(1)(A).

addresses the requisite causation by requiring that "such killing results" without imposing a time limitation. Accordingly, the *Evans* canon does not apply to this statute. *See Soler*, 759 F.3d at 233. The statute does not borrow any term of art, so this Court cannot conclude that Congress adopted "the cluster of ideas that were attached to [the] borrowed word." *Morissette*, 342 U.S. at 263.

The Defendant's arguments to the contrary are unavailing. *First*, the Defendant argues that "intentional killing" is synonymous with murder, and points to this Court's jury instructions for support. Def. Reply at 5–6 (noting that the instructions use "intentionally kills" and "murder" interchangeably). But it is the statutory language enacted by Congress that controls the inquiry. *Second*, at oral argument, the Defendant relied on *Merrill v. United States*, 599 F.2d 240 (8th Cir. 1979) (per curiam), in arguing that Section 848(e) codified the year-and-a-day rule. Arg. Tr. at 5–7. The Court is unpersuaded. In *Merrill*, the Eighth Circuit briefly noted in dicta that the "*Ball* rules," including the year-and-a-day rule, "would appear applicable" to that defendant's prosecution under 18 U.S.C. § 2113(e) (killing during a bank robbery). 599 F.2d at 242 (citing *Ball v. United States*, 140 U.S. 118 (1891)). The Court will not adopt the Eighth Circuit's dicta, which assumed, without analysis, that the rule might apply even though the prosecution was not for murder. *See id*. In any event, this out-of-circuit case is not binding on this Court.

*Finally*, to the extent the Defendant argues that this Court is bound by the Supreme Court's decision in *Ball v. United States* to conclude that Section 848(e) incorporated the rule, the Court disagrees. *See* Def. Br. at 10. In *Ball*, the Court held that an indictment for common-law murder in federal territorial land was fatally flawed because it did not allege the time or

place of death.  140 U.S. at 136.  As noted above, the Court recognized in the decision the common-law requirement that the "death transpire[] within a year and a day after the stroke."  *Id.* at 133.  Thus, *Ball* serves as a data point that at the time of the Supreme Court's decision, the year-and-a-day rule was part of the common-law definition of murder.  The decision does not compel the Court to conclude that Congress intended to codify the rule in enacting the non-murder provision that is Section 848(e) almost 100 years later.

Accordingly, the Court denies the Defendant's Rule 29 motion as to Count Two on the grounds that it is barred by the year-and-a-day rule.

### III.    RULE 33

#### A.  LEGAL STANDARD

Finally, the Defendant moves under Rule 33 for a new trial on all counts.  Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Although a "trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, . . . it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'"  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  As the Second Circuit recently clarified, "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."  *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020), *cert. denied*, 142 S. Ct. 425 (2021) (quoting *Sanchez*, 969 F.2d at 1414). Under this standard, a district court "may not 'reweigh the evidence and set aside the verdict

simply because it feels some other result would be more reasonable.'" *Id.* at 188 (quoting *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997)).  A district court must "defer to the jury's resolution of conflicting evidence," absent "a situation in which the evidence was 'patently incredible or defie[d] physical realities.'" *Id.* (quoting *Ferguson*, 246 F.3d at 134).  As with a Rule 29 motion, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Id.* at 189 (citing *United States v. Middlemiss*, 217 F.3d 112, 117 (2d Cir. 2000)).

### B.  ANALYSIS

The Defendant argues that this Court should order a new trial because the "notion that Lopez's fatal shooting was anything other than a personal matter is against the weight of the evidence." Def. Br. at 11.  He faults the Government for relying on Lopez's testimony, who—as a cooperating witness—had "an exceptionally strong motive to tell the government what it wanted to hear," and for failing to use Paige as a corroborating witness for certain aspects of Lopez's testimony. *Id.* at 11–12.

The Court concludes that the Defendant has not met the high bar for a new trial under Rule 33.  Indeed, he practically concedes as much. *See id.* at 12 ("Berry understands that the recent decision in *Archer* constrains the Court's discretion to decide new-trial motions based on the weight of the evidence alone, but he wishes to preserve the issue." (citing *Archer*, 977 F.3d at 188–89)).  As demonstrated by the background recitation above, the evidence "introduced at trial did not preponderate heavily against the jury's verdict." *Archer*, 977 F.3d at 189.  The shooter himself, Lopez, testified how Berry handed him a gun and ordered him to shoot at a rival drug dealer as part of an ongoing turf war.  Lopez testified that he shot at Paige because Berry

25

told him to, not because of a personal vendetta against Paige.  *See* Trial Tr. at 401.  Lopez's

testimony alone is sufficient to support the jury's verdict.  *United States v. Davis*, 176 F.3d 52,

92 (2d Cir. 1999) ("A conviction may be sustained on the basis of the testimony of a single

accomplice, so long as that testimony is not incredible on its face and is capable of establishing

guilt beyond a reasonable doubt.").  But as even the Defendant notes, Lopez's testimony was at

least partially corroborated by Ortiz who testified that Berry told Lopez to "go handle your

business."  Trial Tr. at 278; *see also* Def. Br. at 11 ("Granted, Ortiz corroborated that Berry said

something to Lopez about handling his own business.").  Moreover, Cintron testified that he saw

the Defendant talking to Lopez right before the shooting and hand him something, Trial Tr. at

167–68, and Paige testified that he saw the Defendant with Lopez as Lopez fired the gun on the

basketball court, *id*. at 74.  That it may have been "reasonable" to ask Paige questions about his

interaction with Lopez's sister is not grounds for a new trial.  The Court may not "reweigh the

evidence."  *Archer*, 977 F.3d at 188.

Moreover, as to Count Three, the jury was tasked with determining whether it was *the

Defendant's* "general purpose" in aiding and abetting the murder "to gain a position, or maintain

or increase his existing position, in the enterprise," not Lopez's general purpose.  Jury Instruction

No. 25 at 39, Dkt. No. 132.  In any event, that a defendant may have also had a "personal motive

for committing an act of violence does not preclude his conviction under § 1959 as long as he

likewise was motivated by a desire to increase or maintain his position in the RICO enterprise."

*White*, 7 F.4th at 101–02.  As outlined above, Lopez testified that he attempted to shoot Paige at

Berry's order because he understood that if he did not, he would "have to face the consequences

of [Berry].  I wouldn't have my position no more, probably wouldn't be able to show my face

around anymore." Trial Tr. at 341 (additionally noting that not being allowed on the block would have affected his ability to make an income with the crew). The Court may not "reweigh" this testimony and "set aside the verdict simply because" the Defendant argues his theory "would be more reasonable.'" *Archer*, 977 F.3d at 188.

In sum, this is not "a situation in which the evidence was 'patently incredible or defie[d] physical realities.'" *Id*. Because this is not an "extraordinary circumstance[]" warranting a new trial, the Defendant's Rule 33 motion is denied. *Ferguson*, 246 F.3d at 134.

## IV.    CONCLUSION

For the foregoing reasons, the Defendant's motions pursuant to Rules 29 and 33 are GRANTED in part and DENIED in part. The Court GRANTS his motion for a judgment of acquittal as to Count One because 18 U.S.C. § 1111 incorporated the common-law year-and-a-day rule, and the death of the victim in this case occurred ten years after the actus reus. The Court DENIES the Defendant's motions as to Counts Two and Three.

This resolves Dkt. No. 152.

SO ORDERED.


Dated: May 13, 2022
       New York, New York                   _____
                                                    ALISON J. NATHAN
                                               United States Circuit Judge
                                                 Sitting by Designation